UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ELIZABETH NAUMOVSKI,

                              Plaintiff,

     -v-                                          3:11-CV-1097


BINGHAMTON UNIVERSITY, THE STATE
UNIVERSITY OF NEW YORK; THE STATE
UNIVERSITY OF NEW YORK; JAMES NORRIS;
and NICOLE SCHOLL,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

BOSMAN LAW FIRM, LLC                      AJ BOSMAN, ESQ.
Attorneys for Plaintiff
201 West Court Street
Rome, NY 13440

HON. ERIC T. SCHNEIDERMAN               ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York     Ass't Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224


DAVID N. HURD
United States District Judge

## **TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      A.   Plaintiff's Hiring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      B.   The 2008 to 2009 Season . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
           1.    J.G. Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
           2.    M.S. Parent Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
           3.    Coach Scholl Responds to Allegations . . . . . . . . . . . . . . . . . . . . . .  8
           4.    Staff Warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
           5.    Conclusion of 2008 to 2009 Season . . . . . . . . . . . . . . . . . . . . . . .  9

      C.   The 2009 to 2010 Season . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
           1.    J.G. Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
           2.    Further Staff Warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
           3.    Relaying of J.G. Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
           4.    Plaintiff Meets with AD Norris . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
           5.    Further Parent Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
           6.    AD Norris Meets with J.W. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
           7.    Plaintiff Under Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
           8.    Continued Student Athlete Complaints . . . . . . . . . . . . . . . . . . . . . . .  13
           9.    S.O. Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
           10.   Plaintiff Addresses Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
           11.   E.C. Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
           12.   Continued Personality Conflicts . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
           13.   Coach Scholl and AD Norris Confer RE: Plaintiff's Performance . . . .  17
           14.   Plaintiff Meets with Coach Scholl . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
           15.   Coach Scholl and AD Norris Again Confer RE: Plaintiff's Performance  20
           16.   J.W.'s Parents Receive Anonymous Letter . . . . . . . . . . . . . . . . . . . .  20
           17.   E.C. and O.O. Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
           18.   J.W.'s Parents Phone AD Norris . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

      D.   Plaintiff's Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
           1.    Plaintiff Meets with Coach Scholl . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
           2.    Plaintiff Meets with AD Norris . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
           3.    AD Norris Meets with J.W.'s Parents . . . . . . . . . . . . . . . . . . . . . . . .  22
           4.    Coach Scholl Offers Plaintiff Recommendation . . . . . . . . . . . . . . . . .  22

III.  LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

IV.    DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

       A.    The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

       B.    Individual and Institutional Liability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27
             1.    AD Norris and Coach Scholl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27
             2.    SUNY and SUNY Binghamton  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

       C.    Discrimination Claims—Title VII, Title IX, and § 1983
             (First, Fourth, Seventh) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31
             1.    Sex, Sex Stereotyping, and Sexual Orientation  . . . . . . . . . . . . . . . .    33
             2.    National Origin  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

       D.    Hostile Work Environment Claims—Title VII, Title IX, and § 1983
             (Second, Fifth, Eighth) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

       E.    Retaliation Claims—Title VII, Title IX, and § 1983
             (Third, Sixth, Ninth) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

       F.    New York State Constitution Claims
             (Tenth, Eleventh, Twelfth) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

**MEMORANDUM-DECISION and ORDER**

## I.    INTRODUCTION

Elizabeth Naumovski ("plaintiff" or "Naumovski"), a former Women's Basketball Assistant Coach at Binghamton University, the State University of New York ("SUNY Binghamton"), alleges that she was subjected to discrimination and harassment on the basis of her sex and/or based upon sex stereotyping, national origin, marital status, and perceived sexual orientation, and that she suffered retaliation for engaging in activity protected by federal and state employment discrimination laws and the United States and New York Constitutions.

Naumovski brings claims against SUNY Binghamton; the State University of New York ("SUNY"); James Norris, SUNY Binghamton Athletic Director ("AD Norris"); and Nicole Scholl, SUNY Binghamton Women's Basketball Head Coach ("Coach Scholl") (collectively "defendants") under Title VII of the Civil Rights Act of 1964 ("Title VII"); Title IX of the Education Amendments of 1972 ("Title IX"); the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983; the New York State Constitution; and the New York State Human Rights Law.

Following the completion of discovery, defendants collectively moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment dismissing plaintiff's complaint in its entirety.  Plaintiff opposed.  No reply was submitted.  Oral argument was heard on September 8, 2016 in Utica, New York.  Decision was reserved.

## II.     BACKGROUND

The following facts are drawn from the parties' Local Rule 7.1 Statements and other submissions in connection with the instant motion, and are undisputed or taken in the light most favorable to Naumovski, unless otherwise noted.

### A.     Plaintiff's Hiring

In June 2008, SUNY Binghamton hired plaintiff as a Women's Basketball Assistant Coach. She was hired by Coach Scholl and former SUNY Binghamton Athletic Director Joel Thirer ("Thirer").[1]

Naumovski was hired for a one year appointment. As a Canadian citizen, she required a work visa. SUNY Binghamton applied for and obtained a temporary H-1B work visa for her permitting her to work at the school from approximately August 2008 to August 2009. At the end of her first year of employment, the school petitioned for and was granted a renewal of her H-1B work visa for another one year period, for the 2009 to 2010 school year.

The parties dispute the classification of plaintiff's employment. She contends she was given a term appointment, while defendants argue she had a temporary appointment. Pursuant to school policies, if Naumovski's position was a *term* appointment, the school would be required to give 90 days notice of her termination and payout the remaining time on her contract. By contrast, if her position was a *temporary* appointment, the school would not be required to give any notice or pay for the remaining contract period.

Naumovski submits an offer letter she received from SUNY Binghamton, offering her a full-time, term appointment. Naumovski Affirm., Ex. A. That letter is dated June 10, 2008.

---

[1] AD Norris was named Interim Athletic Director in September 2009, replacing Thirer.

She contends she accepted the offer, signed the acceptance portion of the letter, and returned same to SUNY Binghamton.

Defendants do not dispute that their first offer letter extended a term appointment but contend the letter was sent in error and that subsequent letters mailed and signed by plaintiff correctly classified her appointment as temporary. They submit the same offer letter dated June 10, 2008, classifying her employment as temporary, with a signature by Naumovski dated November 6, 2008. Schultz Decl., Ex. A. An identical offer letter dated August 14, 2008, classifying her employment as temporary, includes a signature by plaintiff dated August 18, 2008. Id., Ex. C. Defendants submit four other pieces of correspondence to Naumovski or on her behalf between July 2008 to May 2009 classifying her employment as temporary. Id., Exs. B, D, F, G.

Naumovski contends that on August 18, 2008, she reported to SUNY Binghamton for her first day of work and there was a second offer letter waiting for her on her desk with a note asking her to sign, date, and return same to the Athletic Department office, which she did.[2] Because she did not start work in June as indicated in the previous letter, she believed the only change made was to her start date. She claims no one ever advised her there was any change or modification to the terms of her appointment. She argues she was initially hired as a term employee by way of the first offer letter she received, but contends she was then wrongfully given a temporary appointment because she is Canadian.

---

[2] This would be Exhibit C, with a signature date of August 18, 2008.

### B.     The 2008 to 2009 Season

During the 2008 to 2009 Women's Basketball season, Coach Scholl had on staff three assistant coaches:  Naumovski; Bernitha Johnson ("Asst. Coach Johnson"); and Denique Graves ("Graves").

### 1.     J.G. Complaint

In December 2008, allegations were first made that plaintiff was having an inappropriate relationship with student athlete J.W.  Naumovski first learned of the allegations when student athlete A.H. came to she and Asst. Coach Johnson.  A.H. informed the two assistant coaches that teammate J.G. sent a text to another teammate stating, "Don't you think it's strange how close B [Asst. Coach Johnson] and Andrea, and Jackie [J.W.] and Bet [Naumovski] are?  I think it's disgusting."

### 2.     M.S. Parent Complaint

In January 2009, en route from an away game in Boston, Naumovski received a text message from Asst. Coach Johnson informing her that the Sadlers, parents of student athlete M.S., came to her complaining of their daughter's playing time and accused Naumovski of favoritism because she was having a "relationship" with J.W.  Plaintiff contends she was completely stunned and angry, but did not think the accusation would be believed.  She soon thereafter heard from J.W., asking in a text message whether she too had heard the rumor of the two being involved in a "relationship."

Coach Scholl contends she was first made aware of allegations of favoritism by Naumovski toward J.W. in January 2009 (presumably after the same away game in Boston), when the parents of a student athlete (again, presumably the Sadlers) alleged that their daughter got less playing time in a game as a result of Naumovski's favoritism of J.W.  Coach

Scholl contends she did not believe plaintiff was exhibiting favoritism and did not think any action was required in response to the parents' allegation since the relationship that she witnessed between Naumovski and J.W. was that of coach and student athlete.

### 3.    Coach Scholl Responds to Allegations

The day after the game, Coach Scholl called Naumovski and advised she heard allegations that she and J.W. were in a relationship, but assured her that she knew it was not true.  According to plaintiff, Coach Scholl further told her it was not her fault, that she was "deeply sorry" that it was happening to her, and that these types of allegations have "ruined coaches' careers."  Coach Scholl assured Naumovski she would "deal with it" when she met with the student athletes for mid-season meetings.  Plaintiff contends Coach Scholl clearly understood that the allegation was sexual in nature; in fact, Coach Scholl told her that J.W. was gay and had dated women in the past.  Naumovski was alarmed and also worried as the Sadler family was wealthy and donated to the SUNY Binghamton Athletic Department.

On January 16, 2009, a few days after the mid-season student athlete meetings, Coach Scholl called plaintiff and stated that it was brought to her attention that she had "patted" J.W. on the head and purchased a Christmas gift for her.  Naumovski reiterated her disbelief that anyone would say that she was "screwing" a student.  Coach Scholl stated that she was going to notify then Athletic Director Thirer.  Asst. Coach Johnson later told plaintiff that Thirer did not believe the allegation either and thought it was "ridiculous."  Regarding the gift, Naumovski explained that she gave t-shirts to two student athletes as a joke surrounding her Canadian heritage.

### 4.    **Staff Warnings**

The following day, January 17, 2009, Coach Scholl convened her staff and advised them to be careful about "touching" student athletes.  Male coaches however were never advised to be careful about touching student athletes nor were they told they could not meet with student athletes.  Coach Scholl then led a team meeting where she made a general statement that the "drama" needs to stop but failed to mention the rumors about plaintiff. This was the only time any action was taken by defendants to address the rumors with the team while Naumovski was still employed by SUNY Binghamton.

### 5.    **Conclusion of 2008 to 2009 Season**

Shortly before the 2008 to 2009 school year ended, Coach Scholl told Naumovski she was happy that she was able to successfully coach J.W. because she herself was not able to give J.W. the "attention" she needed and that J.W.'s performance noticeably improved due to plaintiff's guidance.  Naumovski's performance evaluation for the 2008 to 2009 school year noted no deficiencies in her performance and her contract was renewed for the 2009 to 2010 school year.  Coach Scholl now adds that she recommend to Thirer that plaintiff be given a "satisfactory" rating on her performance review, which was adopted and signed by Thirer on July 21, 2009.

Following the 2008 to 2009 season, Graves was not re-hired and Leah Truncale ("Asst. Coach Truncale") was hired to fill the open position.

### C.    **The 2009 to 2010 Season**

Prior to being appointed as Interim Athletic Director, defendant Norris served as Senior Associate Athletic Director.  Part of his duties included overseeing the Sports Medicine program.

1.    **J.G. Complaint**

As the supervisor of the Sports Medicine program, AD Norris was approached on September 25, 2009 by former Women's Basketball student athlete J.G. and advised that an inappropriate relationship existed between plaintiff and student athlete J.W. as evidenced by excessive telephone calls and text messages, including text messages at odd hours, and the possible giving of rides.  He insists that he did not interpret this to allege a sexual relationship. The same day, he advised Thirer of J.G.'s allegation.  Thirer advised he had previously looked into similar allegations but found them to be untrue and created by disgruntled former members of the Athletic Department.

2.    **Further Staff Warnings**

Norris was appointed Interim Athletic Director on September 30, 2009.  On the same day, Coach Scholl met with her coaching staff and advised them not to have student athletes in their offices anymore because AD Norris was concerned about "perception."  She further advised staff to only text student athletes for academic and basketball purposes, again because of "perception."  Naumovski contends that she began to experience a great deal of stress and anxiety because of the sudden heightened scrutiny on her.

3.    **Relaying of J.G. Complaint**

On October 5, 2009, following the appointment to his new role, AD Norris shared J.G.'s September 2009 complaint with Coach Scholl and asked her to inform plaintiff of the allegation.  Coach Scholl contends she assured AD Norris that there was no inappropriate relationship going on, and further that at no time did anyone ever inform her that Naumovski and J.W. had a romantic, intimate, or sexual relationship, or even that one was suspected, and at no time did she believe one existed.  AD Norris asked Coach Scholl to make

Naumovski aware of the allegation so that she could be sure to continue maintaining the proper separation and to avoid circumstances that could give the appearance of a lack of appropriate separation.

Following that meeting, Coach Scholl spoke with Naumovski, who was upset that allegations were being made about her. Coach Scholl assured her that she did not believe there was anything inappropriate about her relationship with J.W. Coach Scholl considered the issue "over" because she assured both AD Norris and plaintiff that the relationship was appropriate.

### 4.    Plaintiff Meets with AD Norris

On October 5, 2009, to make certain that any "perception" was not held by AD Norris, Naumovski telephoned him and requested a meeting. AD Norris invited her to his office immediately. Upon arriving, she inquired whether he heard the allegations made against her last year and he advised that he heard them this year. She assured him the rumors were untrue and that she was not gay. She complained that the rumors were very upsetting and that she was scared. She contends that in response, AD Norris stated, "Your problem is that you're a single female in your mid-30s," in a tone that suggested "What do you expect?" and raised the palm of his hand up. Naumovski was offended by the statement and stated something to the effect that "Just because I have chosen to put my career first at this point in my life, doesn't mean I deserve these accusations."

By contrast, AD Norris contends that he did not make this comment, that he had no idea if people thought Naumovski was gay or not, that he had no idea either way, and that this statement, in sum and substance, was actually made by plaintiff during her impassioned explanation to him that she was not gay. He submits that many coaches at SUNY

Binghamton were unmarried, and many were in their thirties and he did not consider them to have a "problem." Asst. Coach Truncale and Coach Scholl both point out that neither themselves, Asst. Coach Johnson, nor plaintiff were married nor got married during plaintiff's employment at SUNY Binghamton.

AD Norris contends that during the meeting, Naumovski told him that she did feel like she had a close relationship with J.W. and that she was providing J.W. with grief counseling due to a death in her family. AD Norris reminded her that grief counseling was not within her job duties and that J.W. should seek counseling services from the school. He asserts that he told plaintiff he had no reason to believe there was any inappropriate relationship between her and J.W., but advised her nonetheless to avoid any situations that could give the appearance of the existence of any relationship other than that of coach and student athlete. He insists that he gives this caution to all coaches under his supervision. He further advised to concentrate on coaching the team and assured her he did not believe there to be an inappropriate relationship. He claims he was of the impression that Naumovski was satisfied with the meeting and the outcome because she never informed him otherwise.

### 5.    Further Parent Complaints

The following day, Coach Scholl advised plaintiff that the Sadler family continued to make allegations of an inappropriate relationship and that the family also made the allegations to a different department at SUNY Binghamton.

On October 9, 2009, AD Norris received a call from the mother of student athlete M.S. The parent alleged that plaintiff and J.W. were in an inappropriate relationship, based on alleged excessive text messaging, the giving of rides, telephone calls at odd times, and plaintiff stroking J.W.'s ponytail and patting her on the behind during a game. She claimed

that there were photos circulating and urged him to "put two and two together" when he asked whether it was sexual.

### 6.    AD Norris Meets with J.W.

Following the call, on October 12, 2009, AD Norris contacted SUNY Binghamton Human Resources Director Joe Schultz about the allegations, who advised AD Norris to meet with J.W. and confirm the allegations were not true.  On October 22, 2009, AD Norris met with J.W. to inquire if any coaches acted inappropriately toward her.  J.W. responded that she was "tired of the BS," and that the allegations stemmed from M.S. and her parents (the Sadlers) being upset that M.S. lost playing time to J.W. during the prior season.  She assured him that the relationship between she and Naumovski was that of coach and student athlete and that plaintiff was just trying to make her a better student athlete.  Following this meeting, AD Norris felt confident the issue had been fully addressed.

### 7.    Plaintiff Under Scrutiny

Naumovski, however, alleges that rumors continued to circulate.  Thereafter, she began to observe Coach Scholl and AD Norris monitoring her during practices.  She became constantly concerned with how her interactions with student athletes would be perceived. This interfered with her ability to do her job as she felt she had to avoid all contact with student athletes except in an open setting.  Further, student athletes felt uncomfortable in her presence due to the increased scrutiny she faced.  This caused her to endure additional stress and eventually develop depression.

### 8.    Continued Student Athlete Complaints

In early December 2009, J.W. complained to Naumovski that student athlete E.C. started to pick on her, again suggesting that she and plaintiff were in a relationship.  J.W.

indicated that she had snapped back at E.C. and was "fed up with it." She also informed

Naumovski that E.C. was telling others that Naumovski was fired twice before coming to

SUNY Binghamton for having relationships with student athletes, a totally false accusation.

     **9.**    **S.O. Complaint**

According to AD Norris, he continued to receive complaints that student athletes felt

plaintiff showed favoritism toward J.W. and treated other student athletes unfairly, including

refusing to coach or speak to certain student athletes. On December 7, 2009, student athlete

S.O. stopped by his office. During that meeting, S.O. inquired about transferring schools and

reluctantly told AD Norris that the peer-like relationship between plaintiff and J.W. was

causing her to not have a positive experience on the team. According to AD Norris, S.O.

stated that the favoritism Naumovski exhibited toward J.W., and the unfair treatment that she

and other members of the team received from plaintiff, was causing her to consider leaving

the school. In response to AD Norris's inquiry about why she thought the relationship was

inappropriate, S.O. indicated the giving of rides, excessive phone calls and text messages,

and the giving of gifts.

     **10.**    **Plaintiff Addresses Team**

On December 29, 2009, the entire team met during which time plaintiff addressed the

team herself and stated she was aware of what was being said about her and that it was

harassment and it needed to stop. Coach Scholl said nothing to support Naumovski.

     **11.**    **E.C. Complaint**

On February 4, 2010, AD Norris met with student athlete E.C. who expressed that she

was disturbed by the excessive favoritism Naumovski showed toward J.W. and that

Naumovski had stopped speaking to and coaching E.C. and several other student athletes.

E.C. advised that she did not think there was a romantic or sexual relationship going on because she knew J.W. was in a relationship with someone else.  E.C. told AD Norris that he could observe the favoritism and unfair treatment by observing practices.

According to plaintiff, coaches are each assigned individual student athletes; in the 2009 to 2010 season, she was assigned J.W., E.C., and V.R.  She insists she had no problem with J.W. and E.C. and gave them equal attention during practices.  As to V.R., she asserts she did not refuse to coach her but instead V.R. refused to take any direction from plaintiff.  In fact, Naumovski complained to Coach Scholl multiple times about V.R.'s attitude; V.R. would defy plaintiff and would do the exact opposite of what she told her to do.  Coach Scholl allegedly agreed this was not Naumovski's fault.

### 12.    Continued Personality Conflicts

Coach Scholl contends she became increasingly aware between October 2009 and February 2010 that plaintiff's coaching style was not supportive of the program she was trying to run, and had become a distraction to the team and coaching staff.  For example, Naumovski refused to coach certain student athletes and would, in fact, not even acknowledge or speak to certain student athletes.  She contends that plaintiff consistently challenged her personal style of discipline, wanting her to be harder on the student athletes.

She asserts that on several occasions, she brought up the issue of all student athletes needing to be coached equally.  During a February 9, 2010, staff meeting, Coach Scholl advised there was a concern by some student athletes that they were not being coached equally.  However, according to plaintiff, Coach Scholl never stated that she agreed with those concerns nor that she believed in the necessity of doing that.

Naumovski denies saying that she would not coach all student athletes and instead, Asst. Coach Johnson was the one who made a statement to that effect. Coach Scholl acknowledges that Asst. Coach Johnson echoed the sentiment that not all student athletes deserve to be coached equally, but that Asst. Coach Johnson's coaching did not illustrate this belief as she complied with the head coach's directive. By contrast, plaintiff exhibited this belief in her coaching despite Coach Scholl's direction to the contrary.

Asst. Coach Truncale echoed Coach Scholl's sentiments. According to her, plaintiff said during staff meetings that she would not coach all student athletes equally, and that on more than one occasion, Coach Scholl told the coaches that they needed to coach every student athlete on the team. Notwithstanding, Naumovski failed to do so. Asst. Coach Truncale contends that she observed practices where plaintiff would not even speak to some of the student athletes. She notes that as the 2009 to 2010 season progressed, plaintiff became noticeably increasingly unhappy. She testified that plaintiff did not agree with Coach Scholl's coaching philosophy and frequently became frustrated with her approach to disciplining student athletes; Naumovski had a very confrontational and forceful personality while Coach Scholl had a laid back and conciliatory personality.

This clash of personalities, and Naumovski's frequent disagreement with the coaching style, caused tension within the staff. Asst. Coach Truncale contends that it made Coach Scholl noticeably uncomfortable and eventually caused Coach Scholl to not trust Naumovski. Further, Naumovski's favoritism toward J.W. created a division within the team, and caused the team to resent J.W. because of the attention and favoritism plaintiff showed her. According to Asst. Coach Truncale, Asst. Coach Johnson offered Naumovski advice in an attempt to reconcile the coaching differences.

Asst. Coach Johnson similarly described the personality conflicts between plaintiff and Coach Scholl. She testified that the two conflicted openly about coaching philosophies and it was "a big struggle" over the two seasons that Naumovski was on the staff. She explained that the two

> really bumped heads a lot . . . Coach Bet [Naumovski] is a very–an A type personality. She's Type A. She's very strong, very passionate, a disciplinary [sic]. Nikki Scholl is the complete opposite of that, and at times, Nikki felt a little intimidated . . . I think there was a trust issue there with Nikki for Bet just trusting that Bet was loyal to her. I think Nikki couldn't get past that. I think that ultimately hurt them to be able to work together.

Kerwin Aff., Ex. B, p.39.

Seeing plaintiff's continued unhappiness, both Asst. Coaches Truncale and Johnson suggested that Coach Scholl speak to Naumovski, which she did, but plaintiff continued to only coach certain student athletes and express her disagreement and frustration with the head coaching style.

Naumovski denies that she refused to coach all student athletes or refused to "do things" requested by Coach Scholl. She was never reprimanded or counseled for this alleged insubordination.[3] According to plaintiff, Coach Scholl never shared with her any specific complaints about not coaching student athletes equally.

### 13.    Coach Scholl and AD Norris Confer RE: Plaintiff's Performance

Also on February 9, 2010, Coach Scholl spoke to AD Norris about her concerns with plaintiff's job performance. Prior to that day, both Asst. Coaches Johnson and Truncale asked Coach Scholl to speak to Naumovski because she was visibly unhappy and becoming

---

[3] Defendants contend that as a matter of practice and as a professional courtesy for a coach's future prospects, counseling memos were not placed in a coach's personnel file.

a distraction and detriment to the team.  During her conversation with AD Norris, Coach

Scholl informed him that she and Naumovski were not getting along, their relationship was

strained, and that their coaching styles and personalities were clashing, causing discomfort

on the team and coaching staff.  She also advised him about Naumovski's refusal to coach

certain student athletes despite instruction to the contrary.

AD Norris responded that he had also received complaints about plaintiff's continued

favoritism of J.W. and unfair treatment of other student athletes.  He advised Coach Scholl to

set up a meeting with plaintiff.  Coach Scholl and AD Norris concluded by agreeing to re-visit

the issue after the completion of the 2009 to 2010 season and that they would both watch for

improvement in Naumovski's performance going forward.

### 14.    Plaintiff Meets with Coach Scholl

Later that same day on February 9, 2010, at AD Norris's suggestion, Coach Scholl met

with Naumovski privately and pointed out how she only coaches J.W. and E.C.  Plaintiff

expressed her view that she works with those two student athletes regularly because she was

assigned to guards and they were guards.  According to Naumovski, Coach Scholl responded

"Yeah, you're right" as though she reconsidered and changed her position.  Plaintiff also

informed Coach Scholl that student athletes have the same complaints about *her* favoring

V.R. and O.O.

Coach Scholl did not further bring up the issue of student athletes' perception about

coaching time.  During this private meeting, the two also discussed the student athletes'

attitudes and how the students were running the Women's Basketball program.  According to

Naumovski, Coach Scholl took responsibility for the poor state of the team because she is a

"people pleaser" and acknowledged that her personality was a weakness.

Coach Scholl contends she discussed with plaintiff the need to support her coaching philosophy and decisions, even if she did not agree with them. Naumovski expressed her frustrations with how Coach Scholl coached and ran the team. The two also discussed Naumovski's unhappiness working at SUNY Binghamton and Coach Scholl asked if she could help in any way.

At the conclusion of the February 9, 2010 meeting, Naumovski told Coach Scholl that she was stressed and depressed. Coach Scholl admitted she noticed plaintiff's weight loss and that she appeared to be unhappy and acknowledged it was affecting her work. Naumovski asserts that during this saga, she was so upset about the allegations that she lost 25 to 30 pounds and was often unable to keep food down.

Plaintiff contends that she came away feeling positive after the February 9, 2010, meeting and her relationship with Coach Scholl improved. Coach Scholl characterized it as a "good meeting." Going forward, staff meetings were more relaxed, and the two were friendlier to each other, with Coach Scholl soliciting plaintiff's opinions more and embracing more of her ideas. Notably, Coach Scholl invited Naumovski to observe a game in Connecticut on March 5, 2010. Coach Scholl also approved plaintiff's travel to Rochester, New York on March 8, 2010, to scout a potential student athlete.

Coach Scholl on the other hand, contends nothing changed. She asserts she did not raise the issues again because she told Naumovski what she needed to change and she expected it would occur but it did not. Instead, Naumovski continued to coach only certain student athletes. The relationship between the two continued to be strained and plaintiff's coaching presence continued to be a distraction.

**15.    Coach Scholl and AD Norris Again Confer RE: Plaintiff's Performance**

On February 21, 2010, Coach Scholl called AD Norris at home to share her concerns about plaintiff's continued presence on her staff given that the situation had not improved. She advised AD Norris that she felt she needed to replace Naumovski and he agreed.  He informed her that he had received other complaints about her favoritism toward J.W. and that student athletes felt they were treated unfairly.  The two agreed to make the change after the completion of the season in March 2010.

**16.    J.W.'s Parents Receive Anonymous Letter**

On February 24, 2010, J.W. informed Naumovski that her parents received an anonymous, vulgar letter which included allegations of a sexual relationship between the two of them.

Around the same time, plaintiff was informed by student athlete D.P. that three or four other students approached AD Norris with similar allegations.

**17.    E.C. and O.O. Complaints**

On February 26, 2010, and March 2, 2010, AD Norris again met with student athlete E.C. who reiterated her concerns about Naumovski.

On March 1, 2010, he met with student athlete O.O. who expressed her concerns about plaintiff's favoritism toward J.W.

**18.    J.W.'s Parents Phone AD Norris**

On March 2, 2010, AD Norris received a call from J.W.'s mother, Linda Ward, asking to meet.  AD Norris informed her of the policy not to meet parents without a student athlete's permission.  They agreed to meet at the conclusion of the season.  He maintains that he did not know what subject matter she wanted to discuss.  By contrast, Linda contends that she

told him she received an anonymous, disturbing letter in the mail and that she feared for the safety of her daughter, J.W.

The basketball season concluded on March 5, 2010.

### D.    Plaintiff's Termination

On March 9, 2010, AD Norris scheduled a meeting with plaintiff.

#### 1.    Plaintiff Meets with Coach Scholl

After her arrival on campus that day, but before meeting with AD Norris, Naumovski met with Coach Scholl.  Plaintiff contends she told her about the anonymous letter sent to J.W.'s family.  By contrast, Coach Scholl testified that she first learned of the letter *from* AD Norris; she does not recall the date but knows that because she learned it from him, she necessarily must have learned about it *after* he did.

#### 2.    Plaintiff Meets with AD Norris

Later, during plaintiff's 2:00 p.m. meeting with AD Norris, he informed her of the decision not to renew her contract.  When pressed for an explanation as to why she was being terminated, he stated "For performance reasons."  Naumovski pleaded that it did not make sense as she had never been told she was doing a bad job; he allegedly responded that it was his decision based on "things [he] witnessed" himself.  He offered her the opportunity to voluntarily resign, which she did.  She later attempted to rescind her resignation on the basis that she felt she did not have a choice during their meeting.

Prior to the meeting, AD Norris had contacted Human Resources and learned that he did not have to provide plaintiff the typical lengthy notice because she had a temporary rather than a term appointment.  Therefore, during the March 9, 2010, meeting, Naumovski was advised that her employment with SUNY Binghamton would be terminated as of March 23,

2010.  As is standard procedure, AD Norris directed that she not have any contact with student athletes and to remove her belongings from campus by that date.

Later that day, AD Norris met briefly with the Women's Basketball team to inform them of her departure.

### 3.     AD Norris Meets with J.W.'s Parents

On March 11, 2010, AD Norris met with J.W. and her parents.  He contends that the in person meeting was the first time he learned of the anonymous letter sent to the Wards which stated that J.W. was "screwing" plaintiff and called J.W. and plaintiff a derogatory lesbian slur.

### 4.     Coach Scholl Offers Plaintiff Recommendation

Finally, on the same day, while Naumovski was wrapping up in her office, Coach Scholl asked to speak with her.  She told plaintiff her termination was AD Norris's decision and that she would write a letter of recommendation and that plaintiff could use her as a reference as she would like to see her stay in the coaching field.

## III.   LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim.  Id. at 250 n.4.  The failure to meet this burden warrants denial of the motion.  Id.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party.  Jeffreys, 426 F.3d at 553.  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotations omitted).  Therefore, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts, . . . [s]he must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotations and citation omitted).

A plaintiff's "[m]ere conclusory statements, conjecture or speculation" will not defeat summary judgment.  Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").  Instead, a plaintiff must offer "concrete particulars."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's affidavit because it lacked concrete particulars); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

With this framework in mind, it bears noting that "direct evidence of . . . [discriminatory] intent will only rarely be available, so . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  Holcomb, 521 F.3d at 137 (internal quotations omitted).  The Second Circuit "has long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'"  Walsh v. New York City Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)).

Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  Holcomb, 521 F.3d at 137.  This cautious attitude toward summary judgment in the employment discrimination context cannot excuse a court's obligation to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  Bickerstaff,

196 F.3d at 448.  "Ultimately, the test for summary judgment is whether a reasonable jury could return a verdict for the nonmoving party."  Benedith v. Malverne Union Free Sch. Dist., 38 F. Supp. 3d 286, 311 (E.D.N.Y. 2014) (internal quotations omitted).

## IV.    DISCUSSION

### A.    The Complaint

Plaintiff asserts that she was subjected to a hostile work environment and eventually terminated because (1) she is female; (2) she is Canadian; (3) she is single; (4) she was perceived to be gay; and (5) she complained about the unlawful treatment.

Naumovski's complaint enumerates fifteen causes of action for alleged violations of federal and state law.  She does not delineate which causes of actions are asserted against which defendants.  Each of the fifteen causes of action asserted in the complaint incorporate all of the factual allegations preceding it as well as adopt all of the allegations of each preceding count.  "Consequently, it is virtually impossible to know which allegations of fact are intended to support which claims for relief."  Croons v. N.Y. State Office of Mental Health, 18 F. Supp. 3d 193, 199 (N.D.N.Y. 2014) (internal quotations omitted).

Plaintiff's fifteen causes of action against defendants based on federal and state law fall into three broad categories:  discrimination, hostile work environment, and retaliation. She asserts claims under Title VII, Title IX, § 1983, the New York State Constitution, and the New York State Human Rights Law.  The complaint sets forth the following claims:

> (First) Title VII– discrimination on account of sex, based upon sex stereotyping, and/or national origin
>
> (Second) Title VII– hostile work environment on account of sex and/or based upon sex stereotyping

(Third) Title VII– retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

(Fourth) Title IX– discrimination on account of sex and/or based upon sex stereotyping

(Fifth) Title IX– hostile work environment on account of sex and/or based upon sex stereotyping

(Sixth) Title IX– retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

(Seventh) Fourteenth Amendment– discrimination on account of sex, based upon sex stereotyping, and/or national origin

(Eighth) Fourteenth Amendment– hostile work environment on account of sex and/or based upon sex stereotyping

(Ninth) First Amendment– retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

(Tenth) New York State Constitution, art. I, § 11[4]– discrimination on account of sex, based upon sex stereotyping, and/or national origin

(Eleventh) New York State Constitution, art. I, § 11– hostile work environment on account of sex and/or based upon sex stereotyping

(Twelfth) New York State Constitution, art. I, § 8– retaliation for complaining about and opposing discrimination on account of sex and/or based upon sex stereotyping

---

[4] Plaintiff's complaint cites Article 1, section 1 in the Tenth and Eleventh causes of action. Defendants point out there is no legal basis for plaintiff's claims as section 1 reads: "Rights, privileges and franchise secured; power of legislature to dispense with primary elections in certain cases." Based on subsequent briefing and oral argument, it is clear plaintiff intended to cite to section 11, "Equal protection of laws; discrimination in civil rights prohibited."

(<u>Thirteenth</u>) New York State Human Rights Law– discrimination on account of sex, based upon sex stereotyping, national origin, marital status, and/or perceived sexual orientation

(<u>Fourteenth</u>) New York State Human Rights Law– hostile work environment on account of sex, based upon sex stereotyping, national origin, marital status, and/or perceived sexual orientation

(<u>Fifteenth</u>) New York State Human Rights Law– retaliation for complaining about and opposing discrimination on account of sex, based upon sex stereotyping, national origin, marital status, and/or perceived sexual orientation

**B.    <u>Individual and Institutional Liability</u>**

Naumovski's complaint makes no attempt to distinguish whether, and to what extent, her fifteen causes of action are directed at AD Norris, Coach Scholl, SUNY, or SUNY Binghamton, the latter two being institutional entities.  Rather, plaintiff's pleading elects instead to simply direct each of her fifteen causes of action at "defendants."  This renders it virtually impossible to determine which allegations of fact are intended to support each of her particular claims for relief.

**1.    <u>AD Norris and Coach Scholl</u>**

First, insofar as plaintiff's Title VII claims are directed at AD Norris or Coach Scholl, they cannot be maintained because individuals are not subject to liability under Title VII. <u>Schiano v. Quality Payroll Sys.</u>, 445 F.3d 597, 608 (2d Cir. 2006).  Likewise, numerous district courts in the Second Circuit have found that Title IX does not provide for individual liability.  <u>See</u> <u>Miotto v. Yonkers Public Sch.</u>, 534 F. Supp. 2d 422, 426 (S.D.N.Y. 2008) (collecting cases); <u>see also</u> <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295 (2d Cir. 1995), <u>abrogated on other grounds by</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998).  Similarly, individuals

generally escape liability under the New York State Human Rights Law's general discrimination provision, New York Executive Law section 296(1).[5]

Accordingly, plaintiff's Title VII (<u>First</u>, <u>Second</u>, <u>Third</u>), Title IX (<u>Fourth</u>, <u>Fifth</u>, <u>Six</u>), and New York State Human Rights Law (<u>Thirteenth</u>, <u>Fourteenth</u>, <u>Fifteenth</u>) causes of action against AD Norris and Coach Scholl will be dismissed.

### 2. SUNY and SUNY Binghamton

Second, insofar as Naumovski's § 1983 and New York State Human Rights Law claims are directed at SUNY and SUNY Binghamton, plaintiff's former employer and an instrumentality of the State of New York, they are precluded by the Eleventh Amendment's guarantee of sovereign immunity. "As a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress." <u>Allessi v. N.Y. State Dep't of Corr. & Cmty. Supervision</u>, 16 F. Supp. 3d 221, 225 (W.D.N.Y. 2014).

"For purposes of the Eleventh Amendment, [SUNY] Upstate, a division of the State University of New York, 'is an integral part of the government of the state of New York and when it is sued the State is a real party." <u>Richman v. Pediatric Serv. Grp., LLP</u>, 222 F. Supp. 2d 207, 209 (N.D.N.Y. 2002) (Munson, S.J.) (internal quotations omitted). Consequently, "SUNY Upstate, as a state instrumentality, is entitled to immunity absent a waiver or abrogation of its Eleventh Amendment Immunity." <u>Idlisan v. SUNY Upstate Med. Univ.</u>, No.

---

[5] Individual employees may be liable for aiding and abetting discriminatory practices under New York Executive Law § 296(6), but plaintiff has not made that argument. <u>See</u> <u>Pellegrini v. Sovereign Hotels, Inc.</u>, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) (Sharpe, J). In support of their motion, defendants argue that there is no proof in this case that AD Norris or Coach Scholl ever participated in the alleged rumors or harassment such that liability under the New York State Human Rights Law could be imputed to then. Plaintiff has failed to respond to that argument.

5:12-CV-1790, 2013 WL 495409, at *3 (N.D.N.Y. Jan. 16, 2013) (Dancks, M.J.) (Report &

Recommendation), adopted by 2013 WL 486279 (N.D.N.Y. Feb. 7, 2013) (D'Agostino, J.).

New York has not waived its sovereign immunity from § 1983 or New York State

Human Rights Law claims in federal court.  Quadir v. N.Y.S. Dep't of Labor, 39 F. Supp. 3d

528, 537-38, 2014 WL 4086296, at *4 (S.D.N.Y. Aug. 19, 2014) (collecting cases).  Nor has

Congress validly abrogated state sovereign immunity from discrimination claims brought

pursuant to § 1983.  See Bogle-Assegai v. Connecticut, 470 F.3d 498, 509 (2d Cir. 2006)

(affirming dismissal of § 1983 claims against state agency as barred by Eleventh

Amendment).

However, "[i]n Ex parte Young, 209 U.S. 123 (1908), the Supreme Court established

an exception to state sovereign immunity in federal actions where an individual brings an

action seeking injunctive relief against a state official for an ongoing violation of law or the

Constitution."  Brown v. New York, 975 F. Supp. 2d 209, 222 (N.D.N.Y. 2013) (D'Agostino, J).

The doctrine permits a suit to nevertheless proceed against an otherwise immune entity if a

plaintiff names a state official in his or her official capacity provided the plaintiff also

"(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as

prospective."  See In re Deposit Ins. Agency, 482 F.3d 612, 618 (2d Cir. 2007) (internal

quotations omitted).

Even assuming Naumovski intended to name AD Norris and Coach Scholl in their

official capacities, plaintiff still fails to allege any ongoing violation of federal law.  Rather, her

complaint details alleged violations of her rights at a specific time in the past when she was

employed by, and eventually terminated from, SUNY Binghamton.  Although her complaint

suggests that she seeks prospective relief—specifically, an injunction "[r]estraining the

Defendants from engaging in further discriminatory and/or retaliatory treatment"; "[r]equire the Defendants to review and correct all unconstitutional, discriminatory and retaliatory treatment and conduct within the Binghamton University"; "[p]rovide equal opportunities, terms, benefits, and pay to women employees in the Binghamton University"; "[m]andate training and educational programs for employees about discrimination and retaliation"; "[r]equire annual reports demonstrating efforts and success at compliance in providing a discrimination and retaliation-free workplace"; and a declaration "that the Defendants violated the Plaintiff's rights under the law," these cannot be properly characterized as "prospective," since plaintiff does not seek reinstatement or otherwise allege how such relief would remedy a future violation directed at her.  See Brown, 975 F. Supp. 2d at 226 (conducting same analysis and noting the Eleventh Amendment does not permit judgments against state officers declaring that they violated federal law in the past.).

Because Ex parte Young is inapplicable here, plaintiff's § 1983 (Seventh, Eighth, Ninth) and New York State Human Rights Law (Thirteenth, Fourteenth, Fifteenth) causes of action against SUNY and SUNY Binghamton will be dismissed.

As plaintiff cannot maintain New York State Human Rights Law claims against Coach Scholl, AD Norris, SUNY, or SUNY Binghamton, there is no need to consider those claims under any of the below substantive standards.[6]

---

[6]  To the extent plaintiff could move forward on the New York State Human Rights Law claims, they would rise and fall for the same reasons as her Title VII claims.  The New York State Human Rights Law makes it unlawful for an employer to discriminate against an employee because of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status.  N.Y. Exec. Law § 296(1).  The substantive standards applicable under Title VII are also generally applicable to claims of employment discrimination brought under the New York State Human Rights Law.  Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).

C.    **Discrimination Claims—Title VII, Title IX, and § 1983**
      **(First, Fourth, Seventh)**

Plaintiff alleges she was unlawfully discriminated against because she is a single

Canadian female who was perceived to be gay.

Title VII makes it unlawful for an employer "(1) to fail or refuse to hire or to discharge

any individual, or otherwise to discriminate against any individual . . . because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Title IX

provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to

discrimination under any education program or activity receiving Federal financial

assistance."  20 U.S.C. § 1681(a).[7]  Section 1983, through its application of the Equal

Protection Clause of the Fourteenth Amendment, "protect[s] public employees from various

forms of discrimination."  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).

These types of discrimination claims are generally subject to the analytical framework

first introduced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a three-part

burden-shifting scheme laid out by the Supreme Court in an effort to "sharpen the inquiry into

the elusive factual question of intentional discrimination."  Bucalo v. Shelter Island Union Free

Sch. Dist., 691 F.3d 119, 128 (2d Cir. 2012).

"This framework places the initial burden of establishing a prima facie case of

---

[7]  "Title IX has been construed to prohibit gender discrimination against both students enrolled in federally supported educational programs and employees involved in such programs."  Murray v. New York Univ. Coll. of Dentistry, 57 F.3d 243, 248 (2d Cir. 1995).  Defendants point out that the Second Circuit has not yet held that there is a private cause of action under Title IX, see Summa v. Hofstra Univ., 708 F.3d 115, 131 (2d Cir. 2013), and other Circuits have divided on this issue, see id. at 131 n.1 (collecting cases).  Courts within this Circuit have suggested that such a cause of action may proceed.  See, e.g., Campisi v. City Univ. of New York, No. 15-CV-4859, 2016 WL 4203549, at *4 (S.D.N.Y. Aug. 9, 2016) (collecting cases).

discrimination on the plaintiff, who must demonstrate that:  (1) [s]he is a member of a

protected class; (2) [s]he was qualified for the position in question; (3) [s]he suffered an

adverse employment action; and (4) the adverse action took place under circumstances

giving rise to an inference of discrimination." Croons v. N.Y. State Office of Mental Health, 18

F. Supp. 3d 193, 202 (N.D.N.Y. 2014) (citing Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d

Cir. 2010)).  "A plaintiff's burden of establishing a prima facie case is de minimis." Abdu-

Brisson, 239 F.3d at 467.

Once the plaintiff clears this initial hurdle, "[t]he burden then shifts to the defendant to

offer 'legitimate and non-discriminatory reasons for the adverse employment action

demonstrate in plaintiff's prima facie case.'" Croons, 18 F. Supp. 3d at 202 (quoting Risco v.

McHugh, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012)).

The burden at this stage is also "light," and "[t]he employer need not persuade the

court that it was motivated by the reason it provides; rather it must simply articulate an

explanation that, if true, would connote lawful behavior." Croons, 18 F. Supp. 3d at

202-03.  In other words, "this burden is one of production, not persuasion; it can involve no

credibility assessment." Id. (internal quotations omitted).

"If the defendant satisfies its burden of production, then the presumption raised by the

prima facie case is rebutted and drops from the case." Bucalo, 691 F.3d at 129 (internal

quotations omitted).  "At the final stage, the plaintiff then has 'the opportunity to

demonstrate that the proffered reason was not the true reason for the employment

decision'—a burden that 'merges with the ultimate burden of persuading the court that she

has been the victim of intentional discrimination.'" Id. (quoting Texas Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 256 (1981)).[8]

"[I]n order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply some evidence; it must be enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." Croons, 18 F. Supp. 3d at 203 (internal quotations omitted). In making this determination, a court may examine "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." Bader, 985 F. Supp. 2d at 305.

The substantive standards applicable to claims of employment discrimination under Title VII are generally applicable to claims of gender discrimination under Title IX. See Murray, 57 F.3d at 248. Similarly, "[o]nce action under color of state law is established, the analysis for [§ 1983 employment discrimination] claims is similar to that used for employment discrimination claims brought under Title VII." Demoret, 451 F.3d at 149; see also Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) ("Once action under color of state law is established, Feingold's equal protection claim parallels his Title VII claim.").

### 1. Sex, Sex Stereotyping, and Sexual Orientation

Naumovski asserts sex-based discrimination claims in the First, Fourth, and Seventh causes of action. She alleges she was discriminated against based on her sex, sex stereotyping, and perceived sexual orientation. She namely relies on AD Norris's alleged

---

[8] "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Croons, 18 F. Supp. 3d at 203 (quoting Risco, 868 F. Supp. 2d at 99).

statement about her being a single female in her 30s, but also makes reference in the complaint to being paid less than male coaches and alleges that the Women's Basketball program receives less resources than the Men's Basketball program. However, as plaintiff does not argue the pay or resources allegations in opposition to defendants' arguments on same, those allegations and any claims on that basis are deemed abandoned. Of course, Naumovski also refers to the numerous allegations and rumors that she was engaged in an intimate relationship with another woman, hence the perceived sexual orientation basis.

"Title VII does not, by its express terms, prohibit all arbitrary employment practices. Rather, it is directed only at specific impermissible bases of discrimination such as race, color, religion, sex, or national origin." Dollinger v. State Ins. Fund, 44 F. Supp. 2d 467, 475 (N.D.N.Y. 1999) (McAvoy, C.J.). Quite obviously, the statute prohibits discrimination on the basis of sex. Title VII also protects against sex stereotyping by an employer. See Price Waterhouse v. Hopkins, 490 U.S. 228, 251-52 (1989) ("[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has [impermissibly] acted on the basis of gender.").

Under the gender stereotyping theory of Title VII liability, "individuals who fail or refuse to comply with socially accepted gender roles are members of a protected class." Dawson v. Bumble and Bumble, 398 F.3d 211, 218 (2d Cir. 2005), overruled by Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018). The theory is grounded in the premise that "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Price Waterhouse, 490 U.S. at 251. That is, an employee who faces an adverse employment action "as a result of their employer's animus toward their

exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim . . . ."  Dawson, 398 F.3d at 218.

Similarly, discrimination based on nonconformity with sex stereotypes is a legally cognizable claim under Title IX.  See Riccio v. New Haven Bd. of Educ., 467 F. Supp. 2d 219, 226 (D. Conn. 2006) ("[A] female student, subjected to pejorative, female homosexual names by other female students, can bring a claim of sexual harassment under Title IX.").

Defendants contend plaintiff cannot establish a prima facie case for any of her alleged sex-based discrimination claims.  They argue she has failed to allege any facts that establish discrimination based on sex or based upon failing to conform to gender stereotypes and that her claims of gender stereotyping discrimination are intertwined with non-actionable sexual orientation discrimination.

While defendants acknowledge that Title VII forbids discrimination based on stereotyping, they argue that plaintiff has brought her sex and sex stereotyping claims merely in an attempt to "bootstrap non-actionable harassment based on sexual orientation."  With regard to AD Norris's alleged statement, which he denies making, defendants contend that even taking plaintiff's allegation as true, a single isolated statement may not form the basis for a Title VII (or other) claim.

Until recently, the law of the Second Circuit was that "sexual orientation is not included in the statutory protected class" under Title VII.  Kiley v. American Soc. for Prevention of Cruelty to Animals, 296 F. App'x 107, 109 (2d Cir. 2008) (summary order); see also Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000) ("The law is well-settled in this circuit . . . that [the plaintiff] has no cause of action under Title VII because Title VII does not prohibit harassment or discrimination because of sexual orientation.").  However, on February 26, 2018, the

Second Circuit sitting en banc abrogated <u>Simonton</u> and held that Title VII prohibits discrimination based on sexual orientation.  <u>See</u> <u>Zarda</u>, 883 F.3d at 112 (finding that sexual orientation discrimination is motivated, at least in part, by sex and is thus a subset of sex discrimination).[9]

In <u>Zarda</u>, the Second Circuit explained

> Looking first to the text of Title VII, the most natural reading of the statute's prohibition on discrimination "because of . . . sex" is that it extends to sexual orientation discrimination because sex is necessarily a factor in sexual orientation.  This statutory reading is reinforced by considering the question from the perspective of sex stereotyping because sexual orientation discrimination is predicated on assumptions about how persons of a certain sex can or should be, which is an impermissible basis for adverse employment actions.

<u>Zarda</u>, 883 F.3d at 112.  The Court went on to examine the issue "from the perspective of associational discrimination."  <u>Id</u>.

Of course, defendants concede that Naumovski is a member of at least one protected class recognized by Title VII, Title IX, and § 1983, that is, she is a woman.  However, they contend that she still cannot establish a prima facie case of either sex, sex stereotyping, or sexual orientation discrimination because a single isolated comment alleged to have been made by AD Norris is insufficient to give rise to an inference of discrimination.  Further, they argue plaintiff has made no allegations that she was discriminated against because she exhibited masculine qualities.

---

[9]  Though the parties did not fully brief the issue given the state of the law at the time of the motion's briefing and subsequent oral argument, a claim of discrimination (or hostile work environment or retaliation for that matter) based on sexual orientation or perceived sexual orientation should not catch any party off guard as discrimination on the basis of plaintiff's perceived sexual orientation is really the gravamen of the complaint.

These arguments are rejected.  First, "Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action."  Howard v. MTA Metro-North Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases); see also Bader, 985 F. Supp. 2d at 313 (adopting same approach in an effort to avoid redundancy).

Examining the merits of Naumovski's prima facie showing by viewing the evidence in the record in the light most favorable to her, she has satisfied the "minimal" burden that the first step of the McDonnell Douglas framework demands.  Contrary to defendants' contention, a sex stereotyping claim does not always require a plaintiff to show that discrimination was motivated by the exhibition of masculine qualities.  See Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 121 (2d Cir. 2004) (sex stereotyping based on the belief that a young mother cannot be devoted to her job).  Plaintiff has established that she is a member of several protected classes including being a female and being perceived as gay.  There has been no dispute that she was otherwise qualified for the position or that she suffered an adverse employment action when she was terminated.

Taking the facts in the light most favorable to Naumovski, a reasonable juror could find that her termination took place under circumstances giving rise to an inference of discrimination.  According to plaintiff, AD Norris made the statement that her "problem" was that she was single and in her thirties.  See e.g., Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) ("When, however . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear

a more ominous significance.").  Crediting all reasonable inferences to plaintiff, AD Norris

learned about the anonymous, vulgar letter describing a sexual relationship between

Naumovski and student athlete J.W. immediately prior to firing her.  While defendants Coach

Scholl and AD Norris contend they did not believe the allegations about plaintiff and J.W. to

be sexually based, plaintiff's version of the facts suggests otherwise.  Such inferences are

enough to satisfy Naumovski's minimal burden on a prima facie case.

Turning to the second step of the McDonnell Douglas framework, defendants have

carried their burden of identifying a legitimate, nondiscriminatory reason for Naumovski's

termination which, taken as true, would permit the conclusion that her termination was

nondiscriminatory.  According to defendants, plaintiff was terminated because her coaching

style was not conducive to Coach Scholl's program, she challenged Coach Scholl's decisions,

she refused to coach all the student athletes and showed favoritism, and her personality was

not a good fit for the coaching staff.

Coach Scholl testified that she never knew or perceived plaintiff to be gay and she

never believed the rumors to be true.  Instead, she believed student athletes were jealous of

the coaching attention plaintiff gave J.W.  Coach Scholl maintains that she continued to give

Naumovski her full support regarding the false rumors, however, she became increasingly

unhappy with plaintiff as a coach on her staff.  She contends that Naumovski showed

favoritism despite being advised to coach all student athletes.  She felt plaintiff challenged her

coaching decisions and ultimately decided she was no longer a fit on her coaching staff.  She

informed AD Norris of her concerns and AD Norris again shared the ongoing complaints he

was receiving regarding plaintiff's continued inappropriate favoritism toward J.W. and refusal

to coach other student athletes.  They decided they would inform plaintiff at the end of the

season that her employment was terminated.  Asst. Coaches Johnson and Truncale also testified that Coach Scholl and Naumovski bumped heads often.

However, plaintiff has offered evidence suggesting this was merely a pretext for her termination; she contends she was never disciplined for failing to coach all student athletes, she received only positive or satisfactory performance reviews, that her relationship with Coach Scholl actually began to improve in the latter part of the 2010 season, and that Coach Scholl in fact agreed with many of her points regarding coaching and her own style and personality.  Naumovski has proffered evidence that, when viewed as a whole, is sufficient to permit a rational finder of fact to infer that defendants' decision to terminate her was more likely than not motivated in part by sex-based discrimination.

Therefore, defendants' motion for summary judgment dismissing the sex-based discrimination causes of action based on Title VII, Title IX to the extent it can be pleaded, and § 1983 will be denied.  Accordingly, the First, Fourth, and Seventh causes of action alleging sex-based discrimination will proceed to trial.

## 2.    National Origin

Naumovski asserts national origin discrimination claims in the First and Seventh causes of action.  Aside from stating that she is Canadian and that her employment status was changed from term to temporary *because* she is Canadian, plaintiff has made absolutely no allegations to suggest she was discriminated against on the basis of her national origin. Nor has she provided any evidence of same.

Accordingly, defendants' motion for summary judgment dismissing the Title VII and § 1983 national origin discrimination claims will be granted and those portions of the First and Seventh causes of action will be dismissed.

D.     **Hostile Work Environment Claims—Title VII, Title IX, and § 1983 (Second, Fifth, Eighth)**

Naumovski asserts hostile work environment claims in the following causes of action: (2) Title VII; (5) Title IX; and (8) § 1983.  She alleges she was subjected to a hostile work environment because defendants failed to stop students from gossiping and spreading rumors that she was gay and in a relationship with student athlete J.W.

Title VII prohibits the creation of a hostile work environment.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-67 (1986); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) ("Title VII is violated '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'").  Title IX prohibits the creation a hostile educational environment.  See e.g., Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. Tech., 214 F. Supp. 2d 273, 281 (E.D.N.Y. 2002); Riccio, 467 F. Supp. 2d at 226 (holding that harassment based on nonconformity with sex stereotypes is a legally cognizable claim under Title IX).  Section 1983, through its application of the Equal Protection Clause of the Fourteenth Amendment, also protects public employees from various forms of discrimination, including hostile work environments.  Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014).

The test to determine whether a plaintiff was the victim of a hostile work environment "has objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).  The incidents of which a plaintiff complains "must be more than episodic; they

must be sufficiently continuous and concerted in order to be deemed pervasive." Carrero v. N.Y.C. Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989).

A court must look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether such conduct unreasonably interferes with the plaintiff's work performance. See Harris, 510 U.S. at 23. The standard for showing a hostile work environment under § 1983 and the Equal Protection Clause are essentially the same as under Title VII. Demoret, 451 F.3d at 149 ("[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment . . . on the basis of gender. Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII . . . .").

A plaintiff alleging that her employer violated Title VII by creating a hostile work environment must show "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano, 294 F.3d at 373. With respect to non-employees such as the student athletes in this case, district courts in this Circuit have generally followed the standard for co-workers set forth in Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998) abrogated on other grounds by Cox v. Onondaga Cty. Sheriff's Dept., 760 F.3d 139 (2d Cir. 2014). The Quinn Court explained that an employer may be held liable for the conduct of a co-worker if there was no reasonable avenue for complaint or the employer knew of the conduct and did nothing about it. Quinn, 159 F.3d at 766.

In <u>Peries v. New York City Board Of Education</u>, No. 97 CV 7109, 2001 WL 1328921, at *5-6 (E.D.N.Y. Aug. 6, 2001), the Court held that the co-worker standard articulated in <u>Quinn</u> "was appropriate in the context of student-on-teacher harassment, particularly because school districts can exercise authority over students in a way that is similar (if not greater) to the authority they have over their employees." <u>Andersen v. Rochester City Sch. Dist.</u>, No. 09-CV-6259, 2011 WL 1458068, at *4 (W.D.N.Y. Apr. 15, 2011), <u>aff'd</u>, 481 F. App'x 628 (2d Cir. 2012) (citing <u>Peries</u>, 2001 WL 1328921 at *5-6).  Therefore, like the teacher plaintiff in <u>Anderson</u>, plaintiff here may prevail on her hostile work environment claim for conduct of the student athletes if she can demonstrate (1) that a hostile environment existed and (2) that there was no reasonable avenue for complaint or that defendants knew of the harassment and did nothing about it.

In the present case, drawing all reasonable inferences in plaintiff's favor, she has put forth sufficient evidence to overcome summary judgment on her hostile work environment claims.  Taking her allegations regarding the frequency and severity of the rumors, a reasonable juror could conclude that the harassment was severe or pervasive enough to create an objectively hostile or abusive work environment.  She has testified that the rumors were more than episodic; they began sometime in December 2008 and continued until her termination in March 2010.  She contends that they were concerted and pervasive; they were made by numerous student athletes at different time periods and were repeated to other student athletes, AD Norris, and Coach Scholl.  Looking at the totality of the circumstances, including plaintiff's testimony that the allegations were humiliating, caused her to be depressed, lose weight, and negatively impact her coaching ability, and the corroboration of those negative effects by Coach Scholl and the other assistant coaches, a factfinder could

conclude that the conduct was physically threatening or humiliating, and unreasonably interfered with Naumovski's work performance.  Notably, according to plaintiff, Coach Scholl acknowledged that rumors like this could ruin a coach's career.

Finally, disputed issues of fact exist as to whether defendants knew of the harassment and did nothing about it.  While defendants contend that they did not believe the rumors to be sexually based, Naumovski refutes this.  Moreover, according to her, the only time any action was taken by defendants to address the rumors with the team while she was still employed by SUNY Binghamton was on January 17, 2009, when Coach Scholl led a team meeting where she made a general statement that the "drama" needs to stop but failed to mention the rumors.  Drawing reasonable inferences in plaintiff's favor and considering the totality of the circumstances, it cannot be said that no reasonable jury could find that she suffered a hostile work environment.

Accordingly, defendants' motion for summary judgment dismissing Naumovski's hostile work environment claims will be denied.  Therefore, the <u>Second</u>, <u>Fifth</u>, and <u>Eighth</u> causes of action will proceed to trial.

> **E.    <u>Retaliation Claims—Title VII, Title IX, and § 1983</u>**
> **(<u>Third</u>, <u>Sixth</u>, <u>Ninth</u>)**

Naumovski asserts retaliation claims in the following causes of action:  (3) Title VII; (6) Title IX; and (9) § 1983.  She alleges she was retaliated against when she complained about discriminatory conduct to AD Norris and Coach Scholl and was later terminated.

Title VII prohibits retaliation for opposing discrimination.  42 U.S.C. § 2000e-3(a).  Title IX also prohibits retaliation "against a person because that person has complained of sex discrimination."  <u>Jackson v. Birmingham Bd. of Ed.</u>, 544 U.S. 167, 173 (2005).  Section 1983,

through its application of the First Amendment, provides that an employer cannot retaliate against an employee for complaining about discrimination.  See e.g., Howard v. City of New York, 602 F. App'x 545, 548 (2d Cir. Mar. 4, 2015) (summary order).

Title VII and § 1983 claims for retaliation are all "analyzed pursuant to Title VII principles."  Hicks v. Baines, 593 F.3d 159, 162, 164 (2d Cir. 2010).  Similarly, "Title VII and Title IX are governed by the same substantive standards for reviewing claims of . . . retaliation."  Summa, 708 F.3d at 131.  Retaliation claims under Title VII, Title IX, and § 1983 are evaluated under the three-step burden-shifting analysis from McDonnell Douglas.  See Hicks, 593 F.3d at 164 (Title VII and § 1983 claims); see also Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 91-92 (2d Cir. 2011) (Title IX claims).

To make out a prima facie case of retaliation, a plaintiff must demonstrate that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  Fraser v. MTA Long Island Rail Road, No. 14CV7222, 2018 WL 1582076, at *7 (E.D.N.Y. Mar. 31, 2018) (internal quotations omitted).

Once a plaintiff has established a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory rationale for their actions.  See Burdine, 450 U.S. at 254.  The burden then shifts to plaintiff to demonstrate that the employer's stated rationale is

- 44 -

merely a pretext for discrimination and that discriminatory animus is the true reason for the defendants' actions.  See McDonnell Douglas, 411 U.S. at 802.

With respect to the first element, "[a]n employee's complaint may qualify as protected activity, satisfying the first element of this test, 'so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14-15 (2d Cir. 2013) (quoting Gregory v. Daly, 243 F.3d 687, 701 (2d Cir. 2001)).  "And not just any law—the plaintiff is 'required to have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII.'"  Id. (quoting McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001)).  "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances."  Id. at 15 (internal quotations omitted).  "A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form."  Id.

In Kelly, the Second Circuit explained that "a black police officer who reported overhearing racial slurs made by other police officers against black citizens had not engaged in protected activity despite opposing discrimination by co-employees against non-employees because his opposition was not directed at an unlawful employment practice of his employer." Kelly, 716 F.3d at 15 (internal quotations omitted) (citing Wimmer v. Suffolk Cty. Police Dep't, 176 F.3d 125, 134-35 (2d Cir. 1999)).  In another Second Circuit case, "plaintiff's allegations that her supervisor 'berated' her and made other harsh comments . . . amount only to general allegations of mistreatment, and do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination."  Drumm v. SUNY Geneseo Coll., 486 F. App'x 912, 914 (2d Cir. 2012) (summary order).

"As to the second element . . . implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

Plaintiff contends she was terminated in retaliation for making complaints about the hostile work environment she was subjected to; that is, for complaining about an environment permeated with rumors that she was gay and allegations of an inappropriate relationship between she and J.W.  Although nothing in Second Circuit caselaw "requires a plaintiff to append to each allegation of harassment the conclusory declaration 'and this was done because of my sex,' the law does require the allegation of factual circumstances that permit the inference that plaintiff was subjected to a hostile work environment because of her sex." Kelly, 716 F.3d at 15 (internal quotations omitted).  Naumovski alleges that her sex played a substantial role in the student athletes' behavior, that is, the rumors were based on the belief or allegation that plaintiff was gay and in a relationship with a female student athlete.  Taking all reasonable inferences in Naumovski's favor, a reasonable juror could conclude that plaintiff herself had a good faith belief that the rumors constituted harassment which violated the law.

With respect to whether her employer was aware of that activity, disputed issues of fact exist as to whether Coach Scholl or AD Norris knew or should have known that she was complaining about or opposing an employment practice made unlawful by Title VII. According to plaintiff, defendants knew the allegations were sexually based and not merely allegations of favoritism.  Coach Scholl commented that she knew student athlete J.W. to be gay and plaintiff has alleged that both she and AD Norris understood the nature of the

allegations.  Naumovski sought Coach Scholl's help in dispelling the rumors and getting the harassment to stop.  She made clear that the rumors were the result of discrimination based on her perceived sexual orientation and/or sex.  A reasonable factfinder could conclude that plaintiff's employer was aware she was complaining about a hostile work environment based on her perceived sexual orientation and/or sex.

It is undisputed that plaintiff suffered a materially adverse action when she was terminated.  With respect to whether there was a causal connection between the protected activity and that adverse action, the same disputed issues of fact exist as to this claim as they do to Naumovski's sex-based discrimination claims.  In the former, disputed facts exist as to whether or not plaintiff's termination took place under circumstances giving rise to an inference of discrimination.  Those disputed facts include what AD Norris knew, and when, about the anonymous letter, and what both AD Norris and Coach Scholl said to plaintiff regarding the rumors.  It cannot be said that there can be but one conclusion as to plaintiff's Title VII and Title IX retaliation claims.

Therefore, defendants' motion for summary judgment dismissing those claims will be denied.  The Third and Sixth causes of action alleging retaliation will proceed to trial.

With respect to plaintiff's § 1983 retaliation claim, a plaintiff alleging retaliation must establish speech protected by the First Amendment.  Weintraub v. Bd. of Educ., 593 F.3d 196, 200 (2d Cir. 2010).  For speech by a public employee to be protected by the First Amendment, the employee must be speaking as a citizen on a matter of public concern. Ross v. Breslin, 693 F.3d 300, 305 (2d Cir. 2012).  Whether speech addresses a matter of public concern is a question of law for the court to decide.  Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008).  To answer this question, a court must "evaluate whether the

speech relates to any matter of political, social, or other concern to the community, and whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."  Norton v. Breslin, 565 F. App'x 31, 34 (2d Cir. 2014) (summary order).

  "[M]ere employee grievances do not qualify as matters of public concern."  Hoyt v. Andreucci, 433 F.3d 320, 330 (2d Cir. 2006).  "There is no categorical approach, however, that places all speech aimed at redressing personal grievances in the employment context beyond the scope of the First Amendment."  Norton, 565 F. App'x at 33-34 (internal quotations omitted).  "Rather, whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  Id. at 34 (internal quotations omitted).

  Naumovski alleges that she was terminated for complaining about being subjected to a hostile work environment on the basis of her sex and perceived sexual orientation.  "This is a quintessential employee grievance that may well be protected by the Equal Protection Clause, but not by the First Amendment."  Norton, 565 F. App'x at 34 (internal citation omitted).  "[A] complaint of system-wide discrimination can raise a public concern, but where the complaint is personal in nature and generally related to the employee's own situation, it is unprotected by the First Amendment."  Id. (internal quotations omitted).  Naumovski's First Amendment retaliation claim fails because she has not demonstrated that she was retaliated against for engaging in speech that was a matter of public concern.

  Accordingly, defendants' motion for summary judgment dismissing plaintiff's First Amendment retaliation claim will be granted and the Ninth cause of action will be dismissed.

**F.    New York State Constitution Claims**
    **(Tenth, Eleventh, Twelfth)**

The New York State Constitution guarantees equal protection of the laws and prohibits

discrimination in civil rights.  N.Y. CONST. art. 1, § 11.  New York recognizes a private cause

of action for violations of Article 1, section 11 of the New York State Constitution.  Imperato v.

Otsego Cty. Sheriff's Dep't, No. 13-CV-1594, 2016 WL 1466545, at *31 (N.D.N.Y. Apr. 14,

2016) (Sannes, J.) (citing Brown v. State, 89 N.Y.2d 172, 192 (1996)).  That cause of action

is only available where a plaintiff has no alternative remedies which would protect his or her

interests.  Id. (citing Vilkhu v. City of New York, No. 06-CV-2095, 2008 WL 1991099, at *8

(E.D.N.Y. May 5, 2008)).  Thus, because plaintiff has a viable claim under § 1983,

defendants' motion for summary judgment as to plaintiff's equal protection claims under the

New York State Constitution will be granted and the Tenth and Eleventh causes of action will

be dismissed.

The New York State Constitution's Bill of Rights guarantees freedom of speech and

press.  N.Y. CONST. art. 1, § 8.  Plaintiff's free speech claim under Article I, section 8 of the

New York State Constitution fails for the same reasons that her First Amendment claim fails.

See, e.g., Novak v. Bd. of Educ. of Fayetteville-Manlius Cent. Sch. Dist., 05-CV-0199, 2007

WL 804679, at *7 n.8 (N.D.N.Y. Mar. 14, 2007) (Scullin, J.) (noting that Article I, section 8

"contains free speech protections that are analogous to those in the federal constitution, and

the same legal standards apply").  Accordingly, defendants' motion for summary judgment as

to plaintiff's free speech claim under Article I, section 8 of the New York State Constitution will

be granted and the Twelfth cause of action will be dismissed.

## V.    **CONCLUSION**

Defendants' motion for summary judgment will be granted in part and denied in part.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2.  Defendants' motion for summary judgment is GRANTED and the following claims are DISMISSED:

(a) All Title VII (First, Second, Third) and Title IX (Fourth, Fifth, Six) causes of action against defendants James Norris and Nicole Scholl;

(b) All § 1983 (Seventh, Eighth, Ninth) causes of action against defendants Binghamton University, the State University of New York and the State University of New York;

(c) All New York State Human Rights Law (Thirteenth, Fourteenth, Fifteenth) causes of action against all defendants;

(d) All national origin based causes of action (First, Ninth, Tenth, Thirteenth) against all defendants;

(e) All New York State Constitution (Tenth, Eleventh, Twelfth) causes of action against all defendants;

(f) The § 1983 First Amendment retaliation (Ninth) cause of action against all defendants; and

(g) Any and all claims asserted against John and/or Jane Does;

3. Defendants' motion for summary judgment is DENIED and the following claims REMAIN for trial:

(a) Title VII sex-based discrimination (First), hostile work environment (Second), and retaliation (Third) causes of action against defendants Binghamton University, the State University of New York and the State University of New York;

(b) Title IX sex-based discrimination (Fourth), hostile work environment (Fifth), and retaliation (Sixth) causes of action against defendants Binghamton University, the State University of New York and the State University of New York;

(c) 42 U.S.C.§ 1983 sex-based discrimination (Eighth) and hostile work environment (Ninth) causes of action against defendants James Norris and Nicole Scholl; and

4. Trial is scheduled for September 10, 2018 in Utica, New York.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  April 17, 2018
        Utica, New York.